<u>NOT FOR ENTRY ON PACER</u>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, AND WASHINGTON, *EX. REL.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CARDINAL HEALTH, INC.; CARDINAL HEALTH 108, LLC; CARDINAL HEALTH 118, LLC D/B/A VITALSOURCE GPO; MICHAEL A. MULLEN; ALABAMA ONCOLOGY; CANCER HEALTH TREATMENT CENTER, P.C.; CLEARVIEW CANCER INSTITUTE; COLUMBUS ONCOLOGY AND HEMATOLOGY ASSOCIATES; DAYTON PHYSICIANS, LLC, also known as DAYTON PHYSICIANS NETWORK; HEALTHCARE PARTNERS NEVADA, and its successor in interest, INTERMOUNTAIN HEALTH CARE, INC.; NORTHWEST GEORGIA ONCOLOGY CENTERS, P.C.; SOUTH CAROLINA ONCOLOGY ASSOCIATES, P.A.; TENNESSEE CANCER SPECIALISTS, PLLC; TENNESSEE ONCOLOGY, PLLC; AND DOE HEALTHCARE PROVIDER DEFENDANTS 1 TO 100, <br><br> Defendants. | FIRST AMENDED COMPLAINT <br><br> CIVIL ACTION NO. 18-cv-12039-GAO <br><br> FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b) <br><br> JURY TRIAL REQUESTED |

FILED
IN CLERKS OFFICE
2020 AUG 31  PM 3: 56
U.S. DISTRICT COURT
DISTRICT OF MASS.

## FIRST AMENDED COMPLAINT

On behalf of the United States of America, the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia, Relator Omni Healthcare, Inc. ("Relator") files this *qui tam* First Amended complaint against Defendants Cardinal Health, Inc.; Cardinal Health 108, LLC; Cardinal Health 118, LLC d/b/a VitalSource GPO; Michael A. Mullen; Alabama Oncology; Cancer Health Treatment Center, P.C.; Clearview Cancer Institute; Columbus Oncology and Hematology Associates; Dayton Physicians, LLC, also known as Dayton Physicians Network; Healthcare Partners Nevada, and its successor in interest, Intermountain Health Care, Inc.; Northwest Georgia Oncology Centers, P.C.; South Carolina Oncology Associates, P.A.; Tennessee Cancer Specialists, PLLC; and Tennessee Oncology, PLLC under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, the False Claims Acts of the District of Columbia and states described herein, and alleges as follows:

### Preliminary Statement

1.     This lawsuit involves a fraudulent scheme by Defendants Cardinal Health, Inc., Cardinal Health 108, LLC, and Cardinal Health 118, LLC d/b/a VitalSource GPO ("Cardinal" or "Defendants") whereby they paid kickbacks to healthcare providers, or helped arrange such kickbacks, in exchange for an exclusive purchasing arrangement requiring the providers to purchase all or nearly all of their branded pharmaceutical products and generic pharmaceutical products from Cardinal. As such, the payments constitute a blatant improper incentive to induce the purchase of medical goods or services, some of which were reimbursable by the federal government. In addition, by tying the amount of the kickback to overall sales by the provider, Cardinal also created an irresistible incentive for the overutilization of federally-reimbursable

medical goods and services. Consistent with the fraudulent nature of the payments, Cardinal failed to disclose the existence of the payments to the government, as required by law.

2.      In perpetrating its fraudulent scheme, Cardinal was assisted by the Healthcare Provider Defendants, as described and defined more fully below, consisting of physicians, physician groups, hospitals, and other healthcare providers who caused the submission of kickback-tainted claims and accepted illegal upfront rebates and prebates in exchange for agreeing to exclusive drug-purchasing arrangements. Defendant Michael A. Mullen, a senior Cardinal executive, was responsible for administering the Cardinal kickback scheme during the period September 2014 through October 2018. Together, Cardinal, the Health Care Provider Defendants, and Mullen are referred to as "Defendants" herein.

3.      The Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), expressly prohibits any individual or entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback, bribe, or rebate," to "any person to induce such person" to purchase or recommend a drug or service that is covered by Medicare or Medicaid. As early as July 2000, the Government gave notice to healthcare companies like Cardinal that they would violate the AKS by offering financial benefits to end-users of medical products and services as an inducement to enter into exclusive purchasing arrangements which caused or tended to cause overutilization of federally-reimbursable medical drugs or services. There, the government warned that upfront payments made by group purchasing organizations (which include one or more of the Cardinal defendants here) to providers as compensation for entering into exclusive purchasing relationships were "obviously" incentives to induce the purchase of goods and services and likewise had the practical effect of "increasing the potential for overutilization." *See* OIG Correspondence: Up-Front Rebates, Healthcare Compl. Rep. ¶ 530,017, 2000 WL 36716010. By

explicitly tying the amount of its kickbacks to the dollar-volume of medical care products and services utilized by healthcare providers, Cardinal knowingly and purposively engaged in the very fraudulent practice the Government had warned against.

4.    In furtherance of its kickback scheme, Cardinal concealed key aspects of its payments by attempting to disguise them as "upfront discounts." In other cases, Cardinal sought to disguise the kickbacks as "transition rebates" and "technology rebates." In all, as much as 40% of its customer-base received disguised kickbacks over at least a seven-year period.

5.    In its negotiations with health care providers, it was part of Cardinal's fraudulent scheme to falsely claim that the payments were exempt from the AKS pursuant to the "discount safe harbor," as set forth in the AKS, 42 U.S.C. § 1320a-7b(b)(3)(A), and as implemented by subsequent regulations. *See* 42 C.F.R. § 1001.952(h). But in contrast to the requirements of the safe harbor, the kickbacks paid by Cardinal were not the result of arms-length negotiations reflecting commercially reasonable terms, but were instead an arbitrary amount selected by Cardinal based on its own estimated dollar-amount of future purchases by the provider. Also in violation of clear government directives, Cardinal paid the entire amount at the time it signed each agreement rather than making the payments on an "as earned" basis when subsequent sales occurred. Cardinal also frustrated governmental-required reporting obligations by failing to disclose such payments to the government and by providing inadequate information about the timing and amount of the payments to providers. For these reasons, Cardinal knew that the payments it made were illicit in nature.

6.    Publicly-funded health care programs are forbidden by law and by regulation from reimbursing healthcare providers for medical goods and services that were ordered as a result of the payment of kickbacks. Nevertheless, as part of its scheme, Defendants caused false claims for

reimbursement to be submitted and honored by the United States – claims that would have not been paid had the government known of Defendants' improper kickback scheme. In so doing, Defendants knew that their conduct was illegal or, at the very least, acted in reckless disregard of the law, for the sole purpose of increasing profitability and market share.

7.      *Qui Tam* Plaintiff Omni Healthcare, Inc. is a multi-specialty physician group based in Brevard County, Florida who acting in good faith entered into a contractual arrangement with Cardinal, not knowing of the illicit purpose behind Cardinal's actions. Among other remedies, Relator seeks to recover treble damages and civil penalties in this action, pursuant to the federal False Claims Act, which provides, *inter alia*, that any person who knowingly presents and/or causes to be presented to the United States a false or fraudulent claim for payment is liable for a civil penalty of up to $22,363 for each claim submitted, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729. The False Claims Act also allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government to share in any recovery. 31 U.S.C. § 3730(b).

### Jurisdiction and Venue

8.      All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the state plaintiffs, against the Defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

9.      This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

10.      This Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b). In addition, the Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.

11.     The False Claims Act provides that an action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). The Defendants transact business in this judicial district by, among other things, contracting with healthcare providers, maintaining permanent employees, making significant sales, and submitting, or causing to be submitted, claims for reimbursement to one or more governmental entities. Accordingly, this Court has personal jurisdiction over the Defendants, and venue is appropriate in this district. 31 U.S.C. § 3732(a). Venue is also proper under 28 U.S.C. § 1391.

12.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relator Omni Healthcare, Inc. has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Moreover, prior to the filing this lawsuit and prior to any public disclosures regarding this matter, Relator voluntarily provided the information set forth herein to agents of the United Sates Department of Justice.

13.     None of the allegations or transactions set forth in this Complaint is substantially the same as allegations or transactions that have been publicly disclosed in a Federal criminal, civil or administrative in which the Government or its agent is a party, or in a congressional, administrative or Government Accountability Office, or other Federal report, hearing, audit or investigation, or from the news media.

## Parties

### Relator Omni Healthcare, Inc.

14.     Relator Omni Healthcare, Inc. ("Omni") is a multi-specialty medical professional group with seven locations, all located in Brevard County, Florida. Formed in 1994, it practices

through physicians in the central Florida region and specializes in multiple fields, including endocrinology/diabetes, family medicine, gastroenterology, general surgery, hematology/oncology, internal medicine, orthopedic surgery, pediatrics, radiation oncology, radiology, rheumatology, and urgent care. Some 21 medical professionals deliver medical services at Omni Healthcare's locations.

15.     Beginning in late 2015 and continuing through early 2016, Defendants entered into discussions with Omni concerning participation as a Committed Member in the VitalSource Group Purchasing Organization ("VitalSource GPO"), pursuant to which Defendants would make available certain vendor contracts for the purchase of medical products and services by Omni. Among other terms, Defendants offered to pay Omni what defendants described as an "upfront discount," the amount of which Defendants tied to the total amount of purchases by Omni over a three-year period, provided Omni acquired the pharmaceutical products used in its practice on an exclusive or near-exclusive basis from Cardinal. Despite repeated requests by Omni, Defendants have refused to disclose the methodology for calculating the amount of its payment.

### Plaintiff United States of America

16.     Relator Omni Healthcare brings this action on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

17.     On behalf of the United States, Relator seeks recovery of damages for false or fraudulent claims and statements for medical goods and services made to federal government-funded health programs, including the Medicare Program, Title XVII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396v ("Medicaid"); the United States Department of Defense ("DOD") under the TRICARE (formerly known as CHAMPUS) health care program, 10 U.S.C. §§ 1071-1110b; and the United States

- 7 -

Department of Veteran Affairs ("VA"), Veterans Health Administration, 38 U.S.C., Chapter 17. The false or fraudulent claims and statements at issue also involve payments made by state or local government-funded health assistance programs, including Medicaid, and payments made by other state or local government-funded agencies or entities.

18.     The Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS") funds and oversees the joint federal-state funded Medicaid program for the financially needy. The state plaintiffs participate in the Medicaid program, under which they pay for medical goods and services in certain circumstances and for certain indigent individuals who are beneficiaries of such programs. In turn, each state seeks reimbursement for a portion of its Medicaid expenditures from the federal government.

19.     CMS also funds and oversees the Medicare program, which covers a portion of expenses for eligible individuals. The enrollee must pay plan premiums, co-payments and co-insurance, and also a deductible. Medicare is a federal health insurance program that was established in 1965 to provide health care coverage for individuals age 65 and older, as well as to certain persons under the age of 65 with disabilities. The federal government finances Medicare primarily through payroll taxes on current workers on taxes of social security benefits. The program's cost to the federal government for 2016 (the last year for which data is available) was $672 billion.

20.     TRICARE is the health care system of the United States military, designated to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with

civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-services. A variety of managed care contractors create networks of civilian health care providers that provide medical services and products to TRICARE members.

### State Plaintiffs

21.     Relator brings this action on behalf of the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, and the District of Columbia ("the state plaintiffs"). It brings this action under the *qui tam* provisions of the following false claims acts of the state plaintiffs: California False Claims Law, Cal. Gov. Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, Col Rev. Stat. 25.5-4-303.5 through 25.5-4-310 (2010); Conn. Gen. Stat. § 17b-301d (2010); Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. §§ 68-081-68.09; Georgia State False Medicaid Claims Act, Georgia Code, Title 49, Ch. 4, Art. 7B; Hawaii False Claims Law, HRS § 661-21 *et seq.*; Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5-1 *et seq.*; Iowa False Claims Act, I.C.A. § 685.2 *et seq.*, Louisiana Qui Tam Action Act, La. R.S. 46:438:3 *et seq.*; Maryland False Health Claims Act, Md. Health-Gen. Code Ann. §§ 2-601 through 2-611 (2010); Massachusetts False Claims Act, ALM Ch. 12 § 5A-0 *et seq.*; Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq.*; Minnesota False Claims Act, Minn.Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mon. Code Anno. § 17-8-401 *et seq.*; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann.

§ 357.0101 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b(I)(a)-(b), New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New York False Claims Act, NY State Finance Law, Art. 13, § 187 *et seq.*; North Carolina False Claims act, N.C. Gen. Stat. § 1-605 *et seq.* (2010); Oklahoma Medicaid False Claims Act, 63 Okla St. § 5053.1 *et seq* (2011); Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2010); Tennessee Medicaid False Claims Act, §§ 71-5-181 through 71-5-185; Texas False Claims Act, Texas Human Resources Code, § 36.002 *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; Vermont False Claims Act, 32 V.S.A. § 632, Washington False Claims Act, RCW § 48.80.030, and the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq.*

22.     On behalf of the state plaintiffs, Relator seeks recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but not limited to the federal-state Medicaid programs that are jointly funded by the United States and the state plaintiffs.

## Defendants

23.     Defendant Cardinal Health, Inc. is an Ohio corporation with its principal place of business at 7000 Cardinal Place, Dublin, Ohio. It is a global health care services company which specializes in the distribution of pharmaceuticals and medical products. For its fiscal year 2019, Cardinal Health reported revenue of $145.5 billion and profits of $2.4 billion. It has over 49,000 employees worldwide.

24.     Defendant Cardinal Health 108, LLC is a Delaware limited liability corporation with its principal place of business at 7000 Cardinal Place, Dublin, Ohio.

25.     Defendant Cardinal Health 118, LLC d/b/a VitalSource GPO is a Delaware limited liability corporation with its principal place of business at 7000 Cardinal Place, Dublin, Ohio.

26.     Defendant Michael A Mullen was Senior Vice President and General Manger for Cardinal Health's Specialty Provider Solutions from September 2014 through October 2018.  In that capacity, he was Responsible for Cardinal Health Specialty Pharmaceutical Distribution, VitalSource GPO, Cardinal Health Specialty Pharmacy, and Metro Medical.

27.     The Healthcare Provider Defendants are physicians, physician groups, hospitals, and other healthcare providers who submitted or, by participating in Cardinal's fraudulent scheme, caused the submission of claims for drugs that were kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts.  Additionally, these providers accepted illegal upfront rebates and prebates in exchange for agreeing to exclusively purchase drugs from Cardinal in violation of the AKS. These physician groups include, but are not limited to:

a)     Alabama Oncology, 1024 First Street North, Alabaster, Alabama 35007;

b)     Cancer Health Treatment Center, P.C., whose principal office address is 342 East 109th Avenue, Crown Point, Indiana 46307;

c)     Clearview Cancer Institute, 3601 CCI Drive Northwest, Huntsville, Alabama 35805;

d)     Columbus Oncology and Hematology Associates, whose registered agent is Columbus Oncology Associates, Inc., 810 Jasonway Avenue, Suite A, Columbus, Ohio 43214;

e)   Dayton Physicians, LLC, also known as Dayton Physicians Network, whose registered agent is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219;

f)   Healthcare Partners Nevada, and its successor in interest, Intermountain Health Care, Inc. whose registered agent is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703;

g)   Northwest Georgia Oncology Centers, P.C., whose registered agent is Bruce J. Gould, 531 Roselane Street, Suite 710, Marietta, Georgia 30060;

h)   South Carolina Oncology Associates, P.A., whose registered agent is Robert E. Smith, Jr., M.D., 166 Stonebridge Drive, Columbia, South Carolina 29210;

i)   Tennessee Cancer Specialists, PLLC, whose registered agent is Scott Hitch, Suite 230, 900 E. Hill Avenue, Knoxville, Tennessee 37915;

j)   Tennessee Oncology, PLLC, whose registered agent is Jeffrey F. Patton M.D., Suite 800, 2004 Hayes Street, Nashville, Tennessee 37203; and

k)   Doe Healthcare Providers 1 to 100.

### The Applicable Statutes

28.   The AKS, 42 U.S.C. § 1320a-7b(b), was promulgated by Congress to protect the integrity of federal health programs and to prevent decisions regarding the provision of medical goods and services from being influenced or corrupted by financial motivations. To protect patient and federal healthcare programs, including Medicare and Medicaid, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L.

No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

29.     The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to purchase, . . . order, . . . or recommend purchasing . . . or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Payments by a GPO to healthcare providers to induce them to enter into an exclusive purchasing arrangement violate this statute to the extent that the drugs purchased pursuant to that arrangement are reimbursed by a federal health care program. Violations of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a7(b)(7).

30.     Federal regulations, codified at 42 U.S.C. 1001.952(d), identify certain narrowly defined financial transactions known as "safe harbors" that do not come within the prohibitions of the AKS. Persons or entities relying on the safe harbor exceptions to avoid liability under the AKS have the burden of affirmatively proving their strict compliance with all conditions set forth in the statutory exceptions. None of the "safe harbors" covers the violations of the AKS described in this Complaint.

31.     The Office of Inspector General for the Department of Health and Human Services ("OIG") was created to protect HHS programs and its beneficiaries by, among other things, detecting and preventing fraud. Though HHS has over 300 programs, the majority of OIG's resources are aimed at combating fraud, waste, and abuse in Medicare and Medicaid programs. In

- 13 -

furtherance of that purpose, OIG has construed the AKS as prohibiting distributors or sellers of medical products and services (like defendants) from entering into exclusive purchasing contractual arrangements with end-users whereby the seller agrees to make up-front payments to the purchaser, whether described as "up-front rebates," "signing bonuses," or "prebates." According to OIG, payments for exclusive dealing arrangements "raise issues under the anti-kickback statute because the payments (i.e., remuneration) are obviously incentives to induce the purchase of items or services, some of which are Federally reimbursable." As such, "these practices appear to pose a significant risk of fraud and abuse." Payments made pursuant to such practices are suspect because they are "difficult to trace to ensure proper disclosure" and have improper practical effect of "locking in" purchasers for extended periods of time, thus "increasing the potential for overutilization and interfering with a purchaser's normal cost/quality considerations in ordering specific goods or services." Such payments also do not qualify for any exemption, including the "discount safe harbor," which is applicable to certain discounts and rebates (42 C.F.R. § 1001.952(h)), "because they are made prior to any purchase and are not attributable to identifiable purchases of items or services." *See* OIG Correspondence: Up-Front Rebates, Healthcare Compl. Rep. ¶ 530,017, 2000 WL 36716010. As described in more detail below, the payments made by Defendants that are made the basis of this Complaint have these same improper purposes and effects, and for that reason, among others, are illegal.

32.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

(i.)   "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C.§ 3729(a)(1)(A);

(ii.)   "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); or

(iii.)   "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," *id.* § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1(C)."

"Knowing" within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.* In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation of each such false claim.

### AKS Compliance as Condition of Payment

33.   In 2010, Congress amended the AKS to provide that Medicare or Medicaid claims that include items and services that result in kickback violations are false claims under the Federal False Claims Act. *See* Patient Protection and Affordable Care Act, Publ. L. No. 111-148, 124 Stat. 119 (2010) ("PPACA"), codified at 42 U.S.C. § 1320a-7b(g). PPACA also made clear that specific intent to violate the law or actual knowledge of a kickback violation is not required. Falsely certifying compliance with the AKS in connection with a claim submitted to a federally funded insurance program is likewise actionable under the FCA.

34.   The U.S. Department of Defense regulations for the CHAMPUS program provide that: "Providers seeking payment from the Federal Government through programs such as CHAMPUS have a duty to familiarize themselves with, *and comply with*, the program requirements." 32 C.F.R. § 199.9(a)(4) (emphasis added). Those program requirements, in turn, provide for mandatory suspension or exclusion from CHAMPUS for those found liable for civil fraud against CHAMPUS, or convicted of criminal fraud against any federal health care program; they expressly state that fraud includes:   "[a]rrangements by providers with employees,

- 15 -

independent contractors, suppliers, or others which appear to be designed primarily to overcharge CHAMPUS through various means (such as commissions, fee-splitting, <u>and kickbacks</u>) used to divert or conceal improper or unnecessary costs or profits." 32 C.F.R. § 199.9(c)(12) and (i)(B) and (D) (emphasis added). Per 32 C.F.R. 199.17(r), all fraud, abuse, and conflict of interests requirements for the basic CHAMPUS program, as forth in Part 199, are applicable to the TRICARE program.

### The Fraudulent Scheme

35.     Beginning in at least 2010, Defendant Cardinal recognized what it believed was a big growth opportunity in the specialty drug market. Specialty drugs are typically complex, injectable biologics that are used to treat patients for specific conditions such as rheumatoid arthritis, irritable bowel syndrome, and certain types of cancer. They often require special handling and are usually distributed to patients at doctors' offices or specialty clinics rather than through traditional pharmacies. Spending on specialty drugs has exploded in recent years, increasing from $87 billion in 2012 to $181 billion in 2016. Of the $181 billion in 2016 sales, $45 billion was in the oncology market, the largest single therapeutic category. Although specialty drugs are used by only 2% of the population, their share of prescription spending jumped from 44.7% in 2018 to 47.7% in 2019, nearly half of all spending on prescription drugs.

36.     In or about 2011, Defendant Cardinal brought together several existing and recently acquired companies to form the Specialty Solutions Group ("Specialty Solutions"), within its Pharmaceutical Segment, its largest operating division. Among the companies comprising Specialty Solutions was P4 Healthcare and P4 Pathways, providers of oncology practice and disease management tools to healthcare providers, which Cardinal acquired as part of its purchase of Healthcare Solutions Holding LLC in 2010 for $517 million.

37.     Through its Specialty Solutions division, Cardinal distributes oncology, rheumatology, urology, nephrology and other pharmaceutical products and human-derived plasma products to hospitals, dialysis clinics, physician offices and other healthcare providers; provides consulting, patient support, logistics, group purchasing and other services to pharmaceutical manufacturers and healthcare providers primarily supporting the development, marketing and distribution of specialty pharmaceutical products; and provides specialty pharmacy services.

38.     To lead the newly-formed group as president, Defendant hired Meghan Fitzgerald, a veteran of pharmaceutical giants Pfizer, Merck, and Sanofi. In recognition of the future growth opportunities in the specialty drug market, Fitzgerald called the specialty business "very important to Cardinal Health's future" and said the company was "committed to continue to invest in this market."

39.     Cardinal faced significant challenges in entering the specialty drug market. In particular, at the time of the creation of Specialty Solutions, Cardinal controlled a very small portion of the specialty distribution market for physicians' offices. Competitors AmerisourceBergen and McKesson were estimated to hold about a half and a quarter of that market, respectively. According to a noted expert on pharmaceutical economics and channel strategy, "Cardinal is in some sense a little bit of an also-ran for specialty drug distribution for physicians' offices." That same expert observed that "It's going to be slow going to penetrate the specialty distribution market for Cardinal. They're very behind right now."

40.     Among the component parts of Specialty Solutions is VitalSource GPO, a special pharmaceutical group purchasing organization ("GPO"). In healthcare parlance, a GPO is an entity that uses its size and leverage to negotiate prices with manufacturers, distributors, and other healthcare vendors on behalf of hospitals, nursing homes, and physician groups. According to the

Healthcare Supply Chain Association, a trade association representing GPOs, some 98% of U.S. hospitals utilize GPOs and a growing portion of the long-term care, ambulatory care, home care, and physician practice markets use GPOs. As devised by Cardinal, VitalSource is a GPO focused on community-physician office practices.

41.     As a means to expand its share of the market for the distribution of specialty drugs, Cardinal devised an illegal scheme whereby it would "buy the specialty business" by inducing healthcare providers, including physician groups, to enter into exclusive purchasing agreements. Under the terms of these agreements, the healthcare provider was obligated to purchase on an exclusive basis, or near exclusive basis, its branded and generic pharmaceutical products from Cardinal and as an inducement to enter into the agreement received a bribe or kickback in an amount based on the provider's expected future purchases. It was further a part of the scheme devised by Cardinal that it would attempt to disguise the kickback by falsely claiming that it qualified for an exemption to the federal antikickback statute and that the provider as buyer owed reporting obligations to federal and state regulators who provide reimbursement pursuant to government-administered medical programs.

42.     As part of its scheme, Cardinal engaged Omni Healthcare in discussions concerning an exclusive purchasing agreement, beginning in 2015. Prior to that time, Omni had been a long-term customer of Cardinal competitors AmerisourceBergen and McKesson. Among the Cardinal representatives who made representations to Omni concerning the proposed exclusive purchasing arrangement and otherwise described Cardinal's practices with respect to other healthcare providers was Michael A. Mullen, who at the time was General Manager of Cardinal Specialty based in Atlanta.

43.     Based on numerous conversations with Cardinal representatives, Omni Healthcare was offered the opportunity to enter into an agreement for the provision of pharmaceuticals on an exclusive basis or near-exclusive basis by a Cardinal-owned subsidiary, defendant Cardinal Health 108, LLC, pursuant to the terms of a Letter of Commitment ("LOC") drafted by Cardinal. Specifically, during the negotiations, Cardinal represented that as a term of the LOC, it would make a one-time payment to Omni in consideration for a commitment by Omni to purchase at least 95% of its branded pharmaceutical products and at least 95% of its generic pharmaceutical products for a period of thirty-six months. To that end, the LOC also required Omni to provide documentation to Cardinal sufficient to demonstrate its compliance with these purchase obligations, thus "locking in" Omni for the entire three-year period.

44.     Cardinal further emphasized during the negotiations that the amount of the payment would be based on the dollar amount of pharmaceuticals that Omni estimated it was likely to purchase during the coming three-year period. Thus, the greater the amount of Omni's estimated purchases, the greater the amount of the payment.

45.     It was also part of Cardinal's scheme that any future renewal or extension of exclusive purchasing arrangements (like the LOC) would likewise be based on the dollar-amount of future purchases. In other words, the more goods and services consumed by the provider during the original contract period, the greater the amount of the payment Cardinal would make in a future period. The end-result of the Cardinal scheme was to overstimulate consumption of medical goods and services by providers, who were incentivized to obtain ever-greater payments from Cardinal.

46.     Along with the LOC, Omni was also required to enter into the Cardinal Health VitalSource GPO Participation Agreement ("Participation Agreement") with defendant Cardinal Health 118, LLC d/b/a VitalSource GPO whereby, among other things, VitalSource GPO was

engaged to act as a GPO on behalf of Omni. According to the terms of the Participation Agreement, Omni was to be granted access to vendor contracts for the purchase of products and services, including pharmaceuticals. Like the LOC, the term of the Participation Agreement was three years. Also like the LOC, the Participation Agreement contained language representing that payments made by Cardinal were intended to qualify for legal protection under the "safe harbor" regulations, in the furtherance of Cardinal's scheme to disguise its kickbacks as purported "upfront payments" or "rebates."

47.    The LOC was executed by Cardinal on or about February 15, 2016 and provided for an effective date of January 1, 2016. Shortly after signing the LOC, Cardinal caused a check to be issued to Omni in the amount of $70,673.00, representing the full amount of the payment to Omni for the entire three-year contractual period. Thus, the payment was made prior to the vast majority of the purchases of medical goods and services Omni was entitled to make under the three-year period of the LOC and the Participation Agreement.

48.    When Omni later approached Cardinal with questions about the payment made under the LOC and the Participation Agreement, Cardinal admitted that it had not reported the payment to the government. In its invoices to Omni, Cardinal also failed to disclose to Omni the amount of the kickback payment that was attributable to federally-reimbursable medical supplies or services.

49.    Cardinal also has admitted to Omni that payments made to lock in exclusive purchasing arrangements, like those embodied by the LOC and the Participation Agreement, are a pervasive practice at Cardinal, involving hundreds of health care providers. In many instances, these providers, due to their sophistication and/or candid disclosures to Cardinal concerning the illicit nature of the upfront prebate, were aware at all times that the payment were in fact kickbacks

for an exclusive or near-exclusive purchasing arrangement entered into with the intention of overstimulating demand for federally-reimbursable medical goods and services. Such health care providers include but are not limited to the Healthcare Provider Defendants named herein. Upon information and belief, payments to the Healthcare Provider Defendants are in the millions of dollars.

50.    As part of Defendants' scheme, each of the Healthcare Provider Defendants have entered into agreements with Cardinal whereby they receive kickbacks in exchange for entering into exclusive or near-exclusive purchasing arrangements with Cardinal, through Cardinal-administered programs such as VitalSource, as described herein. For example, each of the foregoing Healthcare Provider Defendants were attendees at a "VitalSource GPO Knowledge" conference held, on information and belief, in September 2018, at which time, Cardinal described the terms of its fraudulent scheme, and the Healthcare Provider Defendants affirmed, reaffirmed, or acquiesced in joining with Cardinal for purposes of executing the scheme.

51.    Because Cardinal and the Healthcare Provider Defendants failed to make any disclosure of the kickback payments to the government, the amounts billed to the federal government and the state plaintiffs were false, which Cardinal knowingly caused. For example, the invoices sent by Cardinal to Omni do not disclose the existence of the rebate or its amount but instead states in generic terms as part of other boilerplate language: "You may be obligated to report the net price paid for products after discounts and rebates. Please review the 'Medicare/Medicaid disclosure in the terms of sale." The "Terms and Conditions of Sale" contain similar boilerplate language. *Id.*

52.    Defendants' scheme caused thousands of false claims to be submitted by healthcare providers to the governments. For example, during the 2016-18 time period that Omni had ordered

branded and generic pharmaceuticals from Defendants, Omni unwittingly submitted hundreds of bills for payment to the federal government, which included charges made to Omni by the Cardinal Defendants and which were subsequently reimbursed by the government. Pursuant to Health Insurance Claim Forms submitted by Omni and corresponding Medicare Remittance Notices, those false payments caused by Defendants' scheme include the following, by way of example:

| Date of Service | Services/ Goods Code | Services/ Goods | Charge | Date Paid | Payment |
|---|---|---|---|---|---|
| 2/6/2017 | J9035 | Bevacizumab injection | $536.00 | 3/7/17 | $231.20 |
| 2/6/2017 | J9035 | Bevacizumab injection | $10,184.00 | 3/7/17 | $4,392.89 |
| 2/27/2017 | J9025 | Azacitidine injection | $450.00 | 4/6/17 | $95.41 |
| 2/27/2017 | J0885 | Epoetin alfa, non-esrd | $460.00 | 4/6/17 | $193.18 |
| 2/27/2017 | J9025 | Azacitidine injection | $1,350.00 | 4/6/17 | $286.24 |
| 2/27/2017 | J0885 | Epoetin alfa, non-esrd | $920.00 | 4/6/17 | $386.36 |
| 3/15/2017 | J1200 | Diphenhydramine hcl injection | $2.00 | 2/7/18 | $0.49 |
| 3/15/2017 | J1200 | Diphenhydramine hcl injection | $2.00 | 4/11/17 | $0.49 |
| 3/15/2017 | J7030 | Normal saline solution infusion | $3.00 | 4/11/17 | $1.46 |
| 3/15/2017 | J9310 | Rituximab injection | $14,150.00 | 4/11/17 | $6,417.02 |
| 3/20/2017 | J1100 | Dexamethasone sodium phosphate | $12.00 | 2/7/18 | $1.10 |
| 3/20/2017 | J2469 | Palonosetron hcl | $390.00 | 2/7/18 | $176.71 |
| 3/20/2017 | J7040 | Normal saline solution infusion | $4.00 | 2/7/18 | $1.46 |
| 3/20/2017 | J9045 | Carboplatin injection | $21.00 | 2/7/18 | $8.53 |
| 3/20/2017 | J9267 | Paclitaxel injection | $220.00 | 2/7/18 | $15.70 |
| 3/20/2017 | J3490 | Drugs unclassified injection | $50.00 | 2/1/18 | 0 |
| 6/15/2017 | J0129 | Abatacept injection | $4,875.00 | 7/21/17 | $2,755.19 |
| 9/14/2017 | J3380 | Injection, vedolizumab | $10,800.00 | 10/24/17 | $4,248.18 |

| Date of Service | Services/ Goods Code | Services/ Goods | Charge | Date Paid | Payment |
|---|---|---|---|---|---|
| 9/14/2017 | J7050 | Normal saline solution infusion | $1.00 | 10/24/17 | $0.38 |
| 10/4/2017 | J1200 | Diphenhydramine hcl injection | $2.00 | 12/26/17 | $0.48 |
| 10/4/2017 | J7030 | Normal saline solution infusion | $3.00 | 12/26/17 | $1.73 |
| 10/4/2017 | J2930 | Methylprednisolone injection | $6.00 | 12/26/17 | $4.70 |
| 10/4/2017 | J9310 | Rituximab injection | $14,150.00 | 12/26/17 | $6,651.51 |
| 10/6/2017 | J1200 | Diphenhydramine hcl injection | $2.00 | 4/30/18 | $0.48 |
| 10/6/2017 | J7030 | Normal saline solution infusion | $3.00 | 4/30/18 | $1.73 |
| 10/6/2017 | J9310 | Rituximab injection | $7,075.00 | 4/30/18 | $3,325.76 |
| 11/20/2017 | J9035 | Bevacizumab injection | $16,080.00 | 12/15/17 | $7,072.65 |
| 12/26/2017 | J9310 | Rituximab injection | $7,075.00 | 1/26/18 | 0 |
| 12/26/2017 | J1200 | Diphenhydramine hcl injection | $2.00 | 1/26/18 | $0.48 |
| 12/26/2017 | J2405 | Ondansetron hcl injection | $16.00 | 1/26/18 | $1.11 |
| 12/26/2017 | J9370 | Vincristine sulfate 1 mg injection | $20.00 | 1/26/18 | $7.81 |
| 12/26/2017 | J9000 | Doxorubicin hcl injection | $60.00 | 1/26/18 | $23.34 |
| 12/26/2017 | J9070 | Cyclophosphamide 100 mg injection | $650.00 | 1/26/18 | $164.88 |
| 12/26/2017 | J9070 | Cyclophosphamide 100 mg injection | $1,300.00 | 1/26/18 | $329.74 |
| 12/26/2017 | J9310 | Rituximab injection | $4,245.00 | 1/26/18 | $1,995.46 |
| 12/26/2017 | J2505 | Injection, pegfilgrastim 6mg | $6,738.00 | 1/26/18 | $3,387.45 |

53.     Approximately 60% of Omni's $4 million annual spending on branded and generic pharmaceuticals obtained through Cardinal was submitted to governmental reimbursement programs. It is believed that the Healthcare Provider Defendants, who unlike Omni had knowledge of the illegal kickback, submitted claims for governmental reimbursement that amounted to several hundred millions of dollars.

54.     The payments made by Cardinal to the Healthcare Provider Defendants as an inducement to enter into its exclusive purchasing agreements do not qualify for any of the statutory exceptions or regulatory "safe harbors" to the AKS, including the so-called "discount" safe harbor. *See*, 42 U.S.C. § 1320a-7b(b)(3)(A) and 42 C.F.R. § 1001.952(h).

55.     Omni believes that the damages to the governments amount to hundreds of millions of dollars, based at least on (i) the size of Cardinal's and the Healthcare Provider Defendants' operations; and (ii) the systematic nature of the statutory and regulatory violations by Cardinal and the Healthcare Provider Defendants which impacted virtually all claims submitted to the governments related to its medical goods and services.

56.     In fact, Cardinal representatives have admitted to Omni that for a seven-year period, as much as 40% of its customer-base has received so-called "upfront rebates," often disguised through the use names such as "transition rebates" and "technology rebates." In all such cases, no disclosures of such rebates were made by Cardinal or by the recipient Healthcare Provider Defendants. As a result, requests for reimbursement to governmental agencies were inflated, with overcharges to the government of hundreds of millions of dollars.

### Claims for Relief

### Count One

#### Federal False Claims Act: Presentation of False Claims
#### (31 U.S.C. § 3729(a)(1)(A))

57.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

58.     By virtue of the acts alleged herein, Defendants, through the acts of their officers, agents, employees, and sales representatives and for the purpose of defrauding the Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or

approval under the Medicare, Medicaid, and other Government health programs to officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1).

59.     As a result, federal monies were lost through payments made in connection with the claims, and other costs and losses were sustained by the Government, and Defendants are liable for treble damages plus the maximum civil penalty of up to $22,363 for each and every false and fraudulent claim made and caused to be made by Defendants, and arising from their conduct as described herein.

### Count Two

#### Federal False Claims Act: False Statements
#### (31 U.S.C. § 3729(a)(2))

60.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

61.     In performing the acts described above, Defendants, through the acts of their officers, agents, employees, and sales representatives, knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

62.     The United States, unaware of the foregoing circumstances and conduct of Defendants, made full payments, and Defendants are liable for treble damages plus the maximum penalty of up to $22,363 for each and every false and fraudulent claim paid or approved, arising from Defendants' conduct as described herein.

### Count Three

#### (California False Claims Law, Cal. Gov. Code § 12650 et seq.

63.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

64.     This is a claim for penalties and treble damages for violation of the California False Claims Act.

65.     By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other California State-funded programs to officers or employees of the state within the meaning of Cal. Gov. Code § 12651(a)(1)

66.     By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other California State-funded programs within the meaning of Cal. Govt. Code § 12651(a)(2)

67.     The California State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices

68.     As a result, California State monies were lost through payments made because of the claims, and other costs and losses were sustained by the California State Government.

69.     Therefore, the California State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

70.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## **Count Four**

### (Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-303.5 through 25.5-4-310)

71.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

72.     This is a claim for penalties and treble damages for violation of the Colorado Medicaid False Claims Act.

73.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Colorado State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Colorado State-funded programs to officers or employees of the state within the meaning of C.R.S.A. § 25.5-4-304.

74.     The Colorado State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

75.     As a result, Colorado State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Colorado State Government.

76.     Therefore, the Colorado State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

77.     Additionally, the Colorado State Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from Defendants' conduct as described herein as well as costs as permitted under the statute.

### Count Five

#### (Connecticut False Claims Act, C.G.S.A. § 17b-301 *et seq.*)

78.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

79.     This is a claim for penalties and treble damages for violation of the Connecticut False Claims Act.

80.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Connecticut State Government, knowingly made, used, and/or caused to be made or used, false

records or statements to get false claims paid or approved under Medicaid and other Connecticut

State-funded programs within the meaning of C.G.S.A. § 17b-301(a) and (b).

81.     The Connecticut State Government, unaware of the falsity, paid claims that it would

not have paid had it known of Defendants' practices.

82.     As a result, Connecticut State monies were lost through payments made because of

the claims, and other costs and losses were sustained by the Connecticut State Government.

83.     Therefore, the Connecticut State Government has been damaged in an amount to

be proved at trial and is entitled to treble damages as permitted by statute.

84.     Additionally, the Connecticut State Government is entitled to the maximum penalty

of $10,000 for each and every false claim paid or approved arising from Defendants' conduct as

described herein as well as costs as permitted under the statute.

**Count Six**

(Delaware False Claims & Reporting Act, 6 Del.C. § 1201 *et seq.*)

85.     Relator repeats and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

86.     This is a claim for penalties and treble damages for violation of the Delaware False

Claims and Reporting Act.

87.     By virtue of the acts described above, Defendants, for the purpose of defrauding

the Delaware State Government, knowingly presented and/or caused to be presented, directly or

indirectly, false or fraudulent claims for payment or approval under Medicaid and other Delaware

State-funded programs to officers or employees of the state within the meaning of 6 Del. C.

§ 1201(a)(1).

88.     By virtue of the acts described above, Defendants, for the purpose of defrauding

the Delaware State Government, knowingly made, used, and/or caused to be made or used, directly

or indirectly, false records or statements to get false claims paid or approved under Medicaid and other Delaware State-funded programs within the meaning of 6 Del. C. § 1201(a)(2).

89.     The Delaware State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

90.     As a result, Delaware State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Delaware State Government.

91.     Therefore, the Delaware State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

92.     Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

<u>**Count Seven**</u>

(District of Columbia Procurement Reform Act, D.C. Code § 2-308 *et seq.*)

93.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

94.     This is a claim for penalties and treble damages for violation of the District of Columbia Procurement Reform Act.

95.     By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly presented and/or caused to be presented, false claims for payment or approval under Medicaid and other District of Columbia-funded programs to officers or employees of the District within the meaning of D.C. Code § 2-308.14(a)(1).

96.     By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly made, used, and/or caused to be made or used,

false records or statements to get false claims paid or approved under Medicaid and other District of Columbia-funded programs within the meaning of D.C. Code § 2-308.14(a)(2).

97.     The District of Columbia Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

98.     As a result, District of Columbia monies were lost through payments made because of the claims, and other costs and losses were sustained by the District of Columbia Government.

99.     Therefore, the District of Columbia Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

100.    Additionally, the Delaware State Government is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

<u>**Count Eight**</u>

<u>(Florida False Claims Act, Fla. Stat. §§ 68-082 *et seq.*)</u>

101.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

102.    This is a claim for penalties and treble damages for violation of the Florida False Claims Act.

103.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Florida State-funded programs to officers or employees of the state within the meaning of Fla. Stat. § 68.082(2(a).

104.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly made, used, and/or caused to be made or used, false

records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State-funded programs within the meaning of Fla. Stat. § 68.082(2(b).

105.    The Florida State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

106.    As a result, Florida State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Florida State Government.

107.    Therefore, the Florida State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

108.    Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### Count Nine

### (Georgia State False Medicaid Claims Act, Georgia Code Ann. § 49-4-168 *et seq.*)

109.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

110.    This is a claim for penalties and treble damages for violation of the Georgia State False Medicaid Claims Act.

111.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly presented and/or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval within the meaning of Ga. Code Ann. § 49-4-138.1(a)(1).

112.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly made, used, and/or caused to be made or used, false

records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program within the meaning of Ga. Code Ann. § 49-4-168.1(a)(2).

113.     The Georgia State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

114.     As a result, Georgia State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Georgia State Government.

115.     Therefore, the Georgia State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

116.     Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### Count Ten

#### (Hawaii False Claims Law, Haw. Rev. Stat. § 661-21 *et seq.*)

117.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

118.     This is a claim for penalties and treble damages for violation of the Hawaii False Claims Act.

119.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Hawaii State-funded programs to officers or employees of the state within the meaning of Haw. Rev. Stat. § 661-21(a)(1).

120.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly made, used, and/or caused to be made or used, false

records or statements to get false or fraudulent claims paid or approved under Medicaid and other Hawaii State-funded programs within the meaning of Haw. Rev. Stat. § 661.21(a)(2).

121.    The Hawaii State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

122.    As a result, Hawaii State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Hawaii State Government.

123.    Therefore, the Hawaii State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

124.    Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## **Count Eleven**

### **(Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/1 *et seq.*)**

125.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

126.    This is a claim for penalties and treble damages for violation of the Illinois Whistleblower Reward and Protection Act.

127.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Illinois State-funded programs to officers or employees of the state within the meaning of 740 Ill. Comp. Stat. § 175/3(a)(1).

128.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly made, used, and/or caused to be made or used, false

records or statements to get false or fraudulent claims paid or approved under Medicaid and other Illinois State-funded programs within the meaning of 740 Ill. Comp. Stat. § 175/3(a)(2).

129.   The Illinois State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

130.   As a result, Illinois State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Illinois State Government.

131.   Therefore, the Illinois State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

132.   Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### **Count Twelve**

(Indiana False Claims & Whistleblower Protection Act, Ind. Code § 5-11-5.5-1 *et seq.*)

133.   Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

134.   This is a claim for penalties and treble damages for violation of the Indiana False Claims and Whistleblower Protection Act.

135.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Indiana State-funded programs to the state within the meaning of Ind. Code § 5-11-5.5-2(b)(1) and (8).

136.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly or intentionally made, used, and/or caused or induced another to make or use, false records or statements to obtain payment or approval of a false claim

under Medicaid and other Indiana State-funded programs within the meaning of Ind. Code § 5-11-5.5-2(b)(2) and (8)

137.    The Indiana State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

138.    As a result, Indiana State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Indiana State Government.

139.    Therefore, the Indiana State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

140.    Additionally, the Indiana State Government is entitled to a civil penalty of at least $5,000 for each and every false or fraudulent claim paid or approved arising from Defendants' conduct as described herein.

**Count Thirteen**

**(Iowa False Claims Act, I.C.A. § 685.2 *et seq.*)**

141.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

142.    This is a claim for penalties and treble damages under the Iowa False Claims Act.

143.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Iowa State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Iowa State-funded programs within the meaning of I.C.A. § 685.2 *et seq.*

144.    The Iowa State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

145.    As a result, Iowa State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Iowa State Government.

146.     Therefore, the Iowa State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

147.     Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from Defendants' conduct as described herein as well as costs as permitted under the statute.

**Count Fourteen**

(Louisiana Medical Ass't Programs Integrity Law, La. Rev. Stat. § 46:438:3 *et seq.*)

148.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

149.     This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

150.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Louisiana State-funded programs within the meaning of La. Rev. Stat. § 46.438.3(A).

151.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of La. Rev. Stat. § 46.438.3(B).

152.     The Louisiana State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

153.     As a result, Louisiana State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Louisiana State Government.

154.    Therefore, the Louisiana State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

155.    Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by medical assistance programs as a result of the violations described herein. La. Rev. Stat. § 46.438.6(B)(2).

**Count Fifteen**

(Maryland False Health Claims Act, Md. Code Health General. § 2-601 *et seq.*)

156.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

157.    This is a claim for penalties and treble damages for violation of the Maryland False Claims Act.

158.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Maryland State Government, knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of Md. Code Health General § 2-601-602.

159.    The Maryland State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

160.    As a result, Maryland State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Maryland State Government.

161.    Therefore, the Maryland State Government has been damaged in an amount to be proved at trial.

162.    Additionally, the Maryland State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. Md. Code Health General § 2-602..

## Count Sixteen

### (Massachusetts False Claims Law, ALM Ch. 12 § 5A-0 *et seq.*)

163.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

164.    This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

165.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth within the meaning of Mass. Gen. L. Ch. 12, § 5B(2).

166.    The Massachusetts Commonwealth Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

167.    As a result, Massachusetts Commonwealth Government monies were lost through payments made because of the claims, and other costs and losses were sustained by the Massachusetts Commonwealth Government.

168.    Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

169.    Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from Defendants' conduct as described herein

## Count Seventeen

### (Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq.*)

170.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

171.    This is a claim for penalties and treble damages under the Michigan Medicaid False Claims Act.

172.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Michigan State Government, made or presented, or caused to be made or presented, to an employee or officer of the State of Michigan a claim under the Social Welfare Act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the State, knowing the claim to be false within the meaning of Mich. Comp. Law § 400.601 *et seq.*

173.    The Michigan Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

174.    As a result, Michigan Government monies were lost through payments made because of the claims, and other costs and losses were sustained by the Michigan Government.

175.    Therefore, the Michigan Government has been damaged in an amount to be proved at trial.

176.    Additionally, the Michigan State Government is entitled to a civil penalty equal to the full amount of the benefit received by Defendants plus triple the amount of damages suffered by the state as a result of the conduct by Defendants as described herein

**Count Eighteen**

**(Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*)**

177.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

178.    This is a claim for penalties and treble damages under the Minnesota False Claims Act.

179.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Minnesota Government, knowingly made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Minnesota Government within the meaning of Minn. Stat. § 15C.01.

180.    The Minnesota Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

181.    As a result, Minnesota monies were lost through payments made because of the claims, and other costs and losses were sustained by the Minnesota Government.

182.    Therefore, the Minnesota Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

183.    Additionally, the Minnesota Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim paid or approved arising from Defendants' conduct as described herein

### Count Nineteen

#### (Montana False Claims Act, Mon. Code Ann. § 17-8-401 *et seq.*)

184.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

185.    This is a claim for penalties and treble damages under the Montana False Claims Act.

186.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Montana State Government, made or presented, or caused to be made or presented, to an employee or officer of the State of Montana a claim knowing the claim to be false within the meaning of M.C.A. § 17-8-402.

187.    The Montana State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

188.    As a result, Montana State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Montana State Government.

189.    Therefore, the Montana State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

190.    Additionally, the Montana State Government is entitled to a civil penalty equal to the full amount of the benefit received by Defendants plus triple the amount of damages suffered by the state as a result of the conduct of the Defendants as described herein

### Count Twenty

#### (Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.0101, *et seq.*)

191.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

192.    This is a claim for penalties and treble damages for violation of the Nevada False Claims Act.

193.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Nevada State-funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(a).

194.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Nevada State-funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(b).

195.     The Nevada State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

196.     As a result, Nevada State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Nevada State Government.

197.     Therefore, the Nevada State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

198.     Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

<b><u>Count Twenty-One</u></b>

<u>(New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b(I)(a)-(b))</u>

199.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

200.     This is a claim for penalties and treble damages for violation of the New Hampshire False Claims Act.

201.     By virtue of the acts described above, Defendants, for the purpose of defrauding the New Hampshire State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other New Hampshire State-funded programs to officers or employees of the state within the meaning of N.H. Rev. Stat. Ann. § 167:61-b(I)(a).

202.     By virtue of the acts described above, Defendants, for the purpose of defrauding the New Hampshire State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other New Hampshire State-funded programs within the meaning of N.H. Rev. Stat. Ann. § 167:61-b(I)(b).

203.   The New Hampshire State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

204.   As a result, New Hampshire State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New Hampshire State Government.

205.   Therefore, the New Hampshire State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

206.   Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from its conduct as described herein.

### **Count Twenty-Two**

#### (New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*)

207.   Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

208.   This is a claim for penalties and treble damages under the New Jersey False Claims Act.

209.   By virtue of the acts described above, Defendants, for the purpose of defrauding the New Jersey State Government, knowingly presented and/or caused to be presented false claims for payment under Medicaid and other New Jersey State-funded programs to the state within the meaning of N.J.S.A. § 2A:32C-2.

210.   The New Jersey State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendant's practices.

211.   As a result, New Jersey State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New Jersey State Government.

212.    Therefore, the New Jersey State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

213.    Additionally, the New Jersey State Government is entitled to the maximum penalty under N.J.S.A. § 2A:32C-3 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

**Count Twenty-Three**

(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*)

214.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

215.    This is a claim for penalties and treble damages for violation of the New Mexico Medicaid False Claims Act.

216.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Mexico State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other New Mexico State-funded programs to the State.

217.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Mexico State Government, knowingly made, used, and/or caused to be made or used, false, misleading, or fraudulent records or statements to obtain or support the approval of or the payment on false or fraudulent claims.

218.    The New Mexico State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

219.    As a result, New Mexico State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New Mexico State Government.

220.    Therefore, the New Mexico State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

221.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### **Count Twenty-Four**

### (New York False Claims Act, NY State Fin. Law § 189(1)(a)-(b))

222.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

223.    This is a claim for penalties and treble damages for violation of the New York False Claims Act.

224.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other New York State-funded programs to officers or employees of the state within the meaning of N.Y. State Fin. Law § 189(1)(a).

225.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other New York State-funded programs within the meaning of N.Y. State Fin. Law § 189(1)(b).

226.    The New York State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

227.    As a result, New York State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New York State Government.

228.    Therefore, the New York State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

229.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every false claim presented and caused to be presented by Defendants and arising from its conduct as described herein.

### Count Twenty-Five

#### (North Carolina False Claims Act, N.C.G.S.A. § 1-605 *et seq.*)

230.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

231.    This is a claim for penalties and treble damages for violation of the North Carolina False Claims Act.

232.    By virtue of the acts described above, Defendants, for the purpose of defrauding the North Carolina State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other North Carolina State-funded programs to officers or employees of the state within the meaning of N.C.G.S.A. § 1-606.

233.    The North Carolina State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

234.    As a result, North Carolina State monies were lost through payments made because of the claims, and other costs and losses were sustained by the North Carolina State Government.

235.    Therefore, the North Carolina State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

236.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## Count Twenty-Six

### (Oklahoma Medicaid False Claims Act, 63 Okla. St. § 5053.1 *et seq.* (2011))

237.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

238.    This is a claim for penalties and treble damages for violation of the Oklahoma Medicaid Program Integrity Act.

239.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Oklahoma State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Oklahoma State-funded programs to officers or employees of the state within the meaning of 56 Okl. St. Ann. § 1005.

240.    The Oklahoma State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

241.    As a result, Oklahoma State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Oklahoma State Government.

242.    Therefore, the Oklahoma State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

243.    Additionally, the Oklahoma State Government is entitled under 56 Okl St. Ann. § 1006 to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from its conduct as described herein.

## Count Twenty-Seven

### (Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1.-1 *et seq.* (2010))

244.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

245.     This is a claim for penalties and treble damages for violation of the Rhode Island False Claims Act.

246.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Rhode Island State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Rhode Island State-funded programs to officers or employees of the state within the meaning of Gen. Laws 1956, § 9-1.1-3.

247.     The Rhode Island State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

248.     As a result, Rhode Island State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Rhode Island State Government.

249.     Therefore, the Rhode Island State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

250.     Additionally, the Rhode Island State Government is entitled under Gen. Laws 1956, § 9-1.1-3 to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## **Count Twenty-Eight**

### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 through 71-5-185)

251.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

252.     This is a claim for penalties and treble damages for violation of the Tennessee Medicaid False Claims Act.

253.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly presented and/or caused to be presented false claims

for payment or approval under Medicaid and other Tennessee State-funded programs to officers or employees of the state within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(A).

254.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee State-funded programs within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(B).

255.    The Tennessee State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

256.    As a result, Tennessee State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Tennessee State Government.

257.    Therefore, the Tennessee State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

258.    Additionally, the Tennessee State Government is entitled under Tenn. Code § 71-5-182(a) to a penalty of not less than $5,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## Count Twenty-Nine

### (Texas Medicaid Fraud Prevention Law, Texas Hum. Res. Code, § 36.002 et seq.)

259.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

260.    This is a claim for penalties and treble damages for violation of the Texas Medicaid Fraud Prevention Law.

261.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, and/or caused to be made, false

statements or representations of material facts on applications for contracts, benefits, or payments under the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(1)(A).

262.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, caused to be made, induced, and/or sought to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, within the meaning of Tex. Hum Res. Code § 36.002(4(B).

263.     The Texas State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

264.     As a result, Texas State monies were lost through payments made because of the false statements or representations, and other costs and losses were sustained by the Texas State Government.

265.     Therefore, the Texas State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

266.     Additionally, the Texas State Government is entitled to a maximum penalty of $10,000 for each and every unlawful act committed by Defendant under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

### <u>Count Thirty</u>

#### <u>(Vermont False Claims Act, 32 V.S.A. § 632)</u>

267.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

268.     This is a claim for penalties and treble damages for violation of the Vermont False Claims Act.

269.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Vermont State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Vermont State-funded programs to officers or employees of the State within the meaning of 32 V.S.A. § 632.

270.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Vermont State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State under Medicaid and other Vermont State-funded programs within the meaning of 32 V.S.A. § 632.

271.   The Vermont State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

272.   As a result, Vermont State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Vermont State Government.

273.   Therefore, the Vermont State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

274.   Additionally, the Vermont State Government is entitled to a maximum penalty of $11,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### Count Thirty-One

#### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)

275.   Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

276.   This is a claim for penalties and treble damages for violation of the Virginia Fraud Against Taxpayers Act.

277.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Virginia Commonwealth-funded programs to officers or employees of the Commonwealth within the meaning of Va. Code Ann. § 8.01-216.3(A)(1).

278.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth under Medicaid and other Virginia Commonwealth-funded programs within the meaning of Va. Code Ann. § 8.01-216.3(A)(2)..

279.   The Virginia Commonwealth Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

280.   As a result, Virginia Commonwealth monies were lost through payments made because of the claims, and other costs and losses were sustained by the Virginia Commonwealth Government.

281.   Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

282.   Additionally, the Virginia Commonwealth Government is entitled to a maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### Count Thirty-Two

#### (Washington False Claims Act, RCW § 48.80.030)

283.   Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

284.    This is a claim for penalties and treble damages for violation of the Washington False Claims Act.

285.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Washington State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Washington State-funded programs to officers or employees of the State within the meaning of RCW § 48.80.030.

286.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Washington State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State under Medicaid and other Washington State-funded programs within the meaning of RCW § 48.80.030.

287.    The Washington State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

288.    As a result, Washington State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Washington State Government.

289.    Therefore, the Washington Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

290.    Additionally, the Washington State Government is entitled to a maximum penalty of $11,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## **Prayer for Relief**

WHEREFORE, Relator Omni Healthcare, Inc. prays for the following relief:

1.    On Counts One through Thirty-two, judgment for the United States or the State, as applicable, against the Defendants in an amount equal to three times the damages the federal or

state plaintiff government, respectively, has sustained because of Defendants' actions, plus a civil penalty in the maximum amount allowed by law for each violation;

2.      On Counts One through Thirty-two, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

3.      Against the Defendants, attorneys' fees, expenses and costs of suit; and

4.      Such other relief as the Court deems just and proper.

Dated: August 10, 2020                         Respectfully submitted,


                                               /s/ Mark L. Josephs
                                               Mark L. Josephs
                                               BBO # 568454
                                               Law Office of Mark L. Josephs, LLC
                                               10 Derne Street
                                               Boston, MA  02114
                                               (857) 250-4998
                                               mark.josephs@markljosephslaw.com


                                               Collin J. Cox
                                               State Bar No. 24031977
                                               YETTER COLEMAN LLP
                                               811 Main Street, Suite 4100
                                               Houston, Texas  77002
                                               (713) 632-8000
                                               ccox@yettercoleman.com


                                               David A. Koenigsberg
                                               MENZ BONNER KOMAR & KOENIGSBERG LLP
                                               One North Lexington Avenue, Suite 1550
                                               White Plains, New York 10601
                                               Tel.: (914) 949-0222
                                               dkoenigsberg@mbkklaw.com

                                               ATTORNEYS FOR PLAINTIFF-RELATOR

state plaintiff government, respectively, has sustained because of Defendants' actions, plus a civil penalty in the maximum amount allowed by law for each violation;

2.      On Counts One through Thirty-two, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

3.      Against the Defendants, attorneys' fees, expenses and costs of suit; and

4.      Such other relief as the Court deems just and proper.

Dated:  August 31, 2020                         Respectfully submitted,


Mark L. Josephs
BBO # 568454
Law Office of Mark L. Josephs, LLC
100 Cambridge Street, 14th Floor
Boston, MA  02114
(857) 226-8251
mark.josephs@markljosephslaw.com


Collin J. Cox
State Bar No. 24031977
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas  77002
(713) 632-8000
ccox@yettercoleman.com


David A. Koenigsberg
MENZ BONNER KOMAR & KOENIGSBERG LLP
One North Lexington Avenue, Suite 1550
White Plains, New York 10601
Tel.: (914) 949-0222
dkoenigsberg@mbkklaw.com

ATTORNEYS FOR PLAINTIFF-RELATOR